Michael Su CHIA, Petitioner–
Appellant,

v.

Steven CAMBRA, Jr., Warden; Attorney General of the State of California, Respondents–Appellees.

No. 99–56361.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 7, 2000.

Filed Feb. 27, 2002.

James Dirks, Sacramento California, for the petitioner-appellant.

Valerie A. Baker, Deputy Attorney General, State of California, Los Angeles, California, for the respondents-appellees.

Before D.W. NELSON, BRUNETTI and KOZINSKI, Circuit Judges.

OPINION

D.W. NELSON, Circuit Judge.

On November 1, 1988, a Los Angeles County Superior Court jury convicted Michael Su Chia ("Chia") of two counts of first degree murder and one count of attempted murder, as well as counts of second degree robbery and conspiracy to commit robbery. Chia's conviction stemmed from a Drug Enforcement Agency ("DEA") sting operation that went tragically wrong. Two DEA agents were killed when the targets of the sting operation decided to rob and murder the agents instead of consummating the drug deal. Chia, however, was not accused of being one of the shooters or of being present when the agents were murdered. Rather he was prosecuted as a co-conspirator, an aider and abettor, and an accomplice.

Chia's defense hinged on explaining his relationship to the shooters and his interactions with them in the days and hours before the murders. Chia contends that, far from being a co-conspirator, he tried to talk one of the shooters, his good friend William Wei Wang ("Wang"), out of the plot. In support of his version of events, Chia sought to introduce at trial statements made by Wang to police after the shooting. The trial court excluded the statements as hearsay. Chia's direct appeals claiming that the trial court's exclusion of Wang's statements violated Chia's constitutional right to present a defense were denied, as were his collateral attacks on his conviction in state court and in the district court below.

The crux of the matter before us is the reliability of Wang's statements. If Wang's statements bear sufficient indicia of reliability and were crucial to Chia's defense, then it was error for the trial court to exclude them. *United States v. Lopez–Alvarez,* 970 F.2d 583, 588 (9th Cir. 1992); *People v. Kaurish,* 52 Cal.3d 648, 276 Cal.Rptr. 788, 802 P.2d 278, 308 (1990). The evidence is overwhelming that the statements were both reliable and crucial to Chia's defense. We are left with a definite and firm conviction that a mistake was committed and that Chia's fundamental due process rights were violated when the trial court excluded Wang's statements.

We reverse the judgment of the district court and remand with instructions to grant the writ of habeas corpus unless the State grants Michael Chia a new trial within a reasonable time.

I.

On the evening of February 4, 1988, DEA agents were watching the apartment of Frank Kow ("Kow"), a major drug dealer. At 10:10 p.m. Michael Chia's black Mitsubishi pulled up in front of Kow's apartment complex. Chia and his friend, William Wang, got out of the Mitsubishi. Wang took a pistol from the rear of the car and walked into the apartment complex. A few minutes later, Chia went up the complex stairs, paced on the landing, and then stood at the top of the stairs for several minutes until Wang came out. Wang and Chia walked back to the Mitsubishi together. Later that night, Wang and Chia were seen together at a local night club.

The next day, drug dealer Kow called DEA agents who had been posing as buyers and leading him on towards a major sting. Kow told the agents to meet him at

11:00 a.m. at a local restaurant. That same morning, DEA agents again saw Chia's black Mitsubishi at Kow's apartment, first at 10:30 a.m. and a second time at 11:30 a.m. Shortly after 11:30 a.m. other DEA agents saw the Mitsubishi enter the parking lot of the restaurant where the rendezvous between Kow and the DEA agents posing as drug buyers was scheduled. Chia got out of his car and talked to Wang and to Mike Chen ("Chen"), who had both arrived at the restaurant parking lot. After speaking with Wang and Chen, Chia entered the restaurant. A few minutes later he reemerged, got back into his car and drove to the restaurant entrance where he conversed briefly with Kow. Chia then drove into a nearby alley. After a brief time, he drove back into the parking lot, stayed for a few minutes, drove out of the lot again, and then reentered.

Meanwhile, three DEA agents posing as drug dealers got into a Volvo in the restaurant parking lot with Kow and drove off. The agents carried a bag containing $80,000 in cash with which to consummate the sting buy from Kow. Kow did not know that the three "drug dealers" were actually DEA agents, and the agents did not know that Kow planned to rob them of the $80,000 rather than sell them drugs. Kow's partners in the plot to rob the agents, Chen and Wang, followed behind the Volvo in a red Nissan. After driving a short while, Kow directed the agents to pull over. Kow got out of the Volvo, stood beside the car, and pointed a gun at the agents. The agents raised their hands. Chen and Wang, in the Nissan, pulled up behind the stopped Volvo. Wang got out of the Nissan, drew his gun, and joined Kow standing next to the Volvo containing the three agents, still sitting with their hands up. Chen remained behind the wheel of the Nissan, ready to make a quick getaway. The agents gave the money bag to Wang and Kow. Wang and Kow then opened fire on the agents. Two of the agents were killed and the third was seriously wounded.

Kow and Wang fled the scene in the Nissan with Chen behind the wheel. Other DEA agents who had been in the area closed in and a car chase ensued. Kow fired at the pursuing agents from the fleeing Nissan. The agents rammed the Nissan and opened fire on the occupants of the disabled car. Kow and Chen were killed and Wang was seriously wounded. Shortly after the shootout, Chia was arrested nearby in his Mitsubishi. Three sets of handcuffs, three ski masks, and .45 caliber ammunition were found in Chia's car. The owner of a gun shop testified that several weeks before the shootout Chia had entered his shop with a companion and that the companion had purchased .45 caliber ammunition.

## II.

Having survived the car chase and shootout, Wang made four separate statements to investigators.

The first statement was made to DEA agents before Wang was wheeled into surgery for treatment of nine gunshot wounds. The DEA agents took pains to insure that Wang understood that he was in danger of death before taking his statement. The agents believed that Wang's statements would be admissible as a dying declaration in case he did not survive the surgery. Wang told the agents that he, Chen, and Kow had planned to rob the drug dealers, that he did not know that they were really DEA agents, and that he did not know of anyone other than himself, Kow, and Chen involved in the actual shooting. Wang admitted to shooting one of the agents three times with a revolver and admitted providing a .45 caliber pistol for the robbery.

Wang made his second statement to a Pasadena police officer later that afternoon, following successful surgery. Wang admitted that he had planned to rob the "drug dealers" in conjunction with Kow and Chen. Wang admitted that he shot two of the agents. He provided details about the staging of the robbery, with the red Nissan following behind the Volvo.

Wang's third statement was given to Pasadena police officers later that evening. The interview was tape recorded and the entire tape was admitted into evidence as a State prosecution exhibit and played for the jury at Wang's subsequent trial. During this interview, the police officer asked about Michael Chia's involvement. Wang had not previously mentioned Chia but had described the involvement of Chen and Kow in the plot. Wang said that Chia told him not to go through with the plan. When pressed by the investigator, Wang said that Chia was not involved in the plot and was not going to get any drugs or money. Wang said that Chia warned him that Chen and Kow might turn on him and rob him. The investigator, not Wang, returned repeatedly to the subject of Chia's involvement. Wang repeated that Chia was not involved in the plot, although he knew about it. Wang said that Chia had dropped him off at Kow's apartment and was present later to protect Wang because he feared Kow and Chen would turn on him.

Wang's fourth and final statement was given to the FBI two days after the shooting. Wang confessed that not only did he plan to rob the agents but that he knew in advance that Kow planned to kill the agents. Wang stated again that Chia told him not to go through with the plot. He also stated that when he spoke with Chia in the restaurant parking lot he had told Chia to go home, but Chia remained to look out for his safety. In response to questions, Wang said that the handcuffs found in Chia's car belonged to an individual named Johnny Lee and that he did not know anything about the ski masks.

Wang's description of his movements preceding the shootings was consistent with his prior statements to law enforcement officers and was consistent with the independent observations of DEA agents. Wang accurately described Chia taking him to Kow's apartment where Wang delivered a gun and ammunition and learned of the final plans for the robbery. He also accurately recounted that he went with Chia to a nightclub that evening, stayed the night with Chia at a friend's house, and was dropped off by Chia at Kow's apartment the next morning.

### III.

The district court's decision to deny a 28 U.S.C. § 2254 habeas petition is reviewed *de novo*. *Alvarado v. Hill*, 252 F.3d 1066, 1068 (9th Cir.2001). Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), a federal habeas court may grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court only if the state court adjudication resulted in a decision that (1) was contrary to clearly established Federal law as determined by the Supreme Court of the United States, or (2) involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States. *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

Under AEDPA "we must reverse a state court's decision as involving an 'unreasonable application' of clearly established federal law when our independent review of the legal question does not merely allow us ultimately to conclude that the

petitioner has the better of two reasonable legal arguments, but rather leaves us with a 'firm conviction' that one answer, the one rejected by the court, was correct and the other, the application of the federal law that the court adopted, was erroneous—in other words that clear error occurred." *Van Tran v. Lindsey*, 212 F.3d 1143, 1153–54 (9th Cir.), *cert. denied*, 531 U.S. 944, 121 S.Ct. 340, 148 L.Ed.2d 274 (2000).

## IV.

■ It is clearly established federal law, as determined by the Supreme Court of the United States, that when a hearsay statement bears persuasive assurances of trustworthiness and is critical to the defense the exclusion of that statement may rise to the level of a constitutional due process violation. *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

■ Under AEDPA, Ninth Circuit case law may be persuasive authority for deciding whether a state court decision unreasonably applied Supreme Court precedent, or it may help us determine what law is clearly established. *Lindsey*, 212 F.3d at 1154. In a habeas proceeding, we have traditionally applied a balancing test to determine whether the exclusion of evidence in the trial court violated petitioner's due process rights, weighing the importance of the evidence against the state's interest in exclusion. *Miller v. Stagner*, 757 F.2d 988, 994 (9th Cir.1985), *amended on other grounds*, 768 F.2d 1090 (9th Cir. 1985). The court must give due weight to the substantial state interest in preserving orderly trials, in judicial efficiency, and in excluding unreliable evidence. *Miller*, 757 F.2d at 995.

■ When deciding whether an evidentiary rule violates the Due Process Clause or the Sixth Amendment, we apply a five-part balancing test. *United States v. Duran*, 41 F.3d 540, 545 (9th Cir.1994); *Whelchel v. Washington*, 232 F.3d 1197, 1211 (9th Cir.2000). The factors considered are (1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense. *Tinsley v. Borg*, 895 F.2d 520, 530 (9th Cir.1990).

## V.

■ Applying the *Tinsley* test to Wang's statements, we conclude that the factors tip overwhelmingly in Chia's favor. We may not reverse a state court decision simply because it is inconsistent with a rule established by a Ninth Circuit case. *Lindsey*, 212 F.3d at 1154. However, application of the *Tinsley* factors persuades us that Wang's statements were clearly both reliable and crucial to Chia's defense. Under *Chambers*, exclusion of these statements was an unreasonable application of clearly established federal law that violated Chia's constitutional due process rights.

*Wang's Third Statement.*

On the paramount issue of reliability (the second factor of the balancing test), the self-inculpatory nature of Wang's statements weighs in favor of admission. The very words in this statement that exculpate Chia are highly inculpatory of Wang. Wang said that after he informed Chia of the plot, Chia tried to talk him out of it. This admission inculpates Wang by removing all doubt as to mens rea. Wang discussed the plot with his friend, was warned not to go through with it, and after plenty of time for reflection decided to go ahead anyway. At the same time, Chia's warning establishes that he was not fur-

thering the conspiracy but, quite the opposite, was discouraging his friend from participating. The inculpatory force of this statement with respect to Wang is obvious, and indeed the government conceded at oral argument that the very words, "he told me don't do it," at once inculpate Wang and exculpate Chia.

■ Self-inculpatory statements have long been recognized as bearing strong indicia of reliability. *See, e.g.,* Fed. Rule Evid. 804(b)(3); *Williamson v. United States,* 512 U.S. 594, 599, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994) ("[R]easonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true."). Wang's third statement therefore bears strong indicia of reliability.

The first and fifth factors of the balancing test, the probative value of the excluded evidence on the central issue and whether it constitutes a major part of the attempted defense, also weigh in Chia's favor. Chia's whereabouts, movements, and actions before and during the commission of the crime are not disputed. The issue is whether his behavior was aimed at facilitating and encouraging the crime as the State contends, or at discouraging the crime and protecting his friend from harm. This question underlies Chia's entire defense, and Wang's statements are extremely probative on this point.

The third factor of the balancing test, whether the evidence is capable of evaluation by the trier of fact, is also satisfied. The jury heard evidence from the State's expert that Chia's observed behavior was consistent with "counter surveillance." In other words, the State's expert theorized that Chia's actions were consistent with criminal behavior aimed at discovering and thwarting police efforts to detect the conspiracy. If Wang's statements were introduced, the jury would be called upon to weigh the plausibility of the State's theory against Wang's testimony, which explained the events in a way that would not subject Chia to criminal liability. Such determinations are well within the province of the fact finder.

The fourth factor, whether the evidence is the sole evidence on the issue or merely cumulative, is also satisfied. Wang exercised his Fifth Amendment rights and refused to testify at Chia's trial. Chia, as was his right, also declined to take the stand. Chia attempted, on cross examination of the State's witnesses, to establish his explanation of events. However, he was not able to elicit testimony from those interested in convicting him that would establish his role in discouraging the conspiracy. Chia was left with Wang's statements as the only means of establishing his role.

Chia's third statement squarely satisfies all of the factors in the balancing test, and clearly should have been admitted.

*Wang's Other Statements.*

Wang's fourth statement adds the information that after Chia arrived at the restaurant parking lot, he told Wang not to go through with the crime. Wang, in turn, told Chia to go home. Chia remained, Wang said, to watch out for Wang's safety, not to further the robbery. In the fourth statement, Wang also admits for the first time that he knew in advance that Kow planned to kill the "drug dealers" as well as rob them. In this statement, Wang admits to being warned not to go through with the crime at a time when he knew that murder was part of the plot. Wang admits an opportunity to back out, presumably with Chia driving him to safety in the black Mitsubishi, moments before the crime commenced. With each re-telling of events Wang recalls more detail (as he

recovers from surgery) and the statements become more self-inculpatory. As his statements progressively exonerate Chia, they also destroy any hope Wang might have for a defense or sentence mitigation based on lack of knowledge or intent.

Wang's first and second statements do not directly exculpate Chia, although they do of course inculpate Wang. In these statements, Wang does not include Chia as he freely describes the planning and execution of the crime. This tends to show Chia was not involved. While the first statement does not technically meet the definition of a dying declaration, it was given when Wang knew that he was in real danger of imminent death, a traditional indicium of reliability.

 The four statements that Wang gave to investigators form a picture of the crime from Wang's point of view and the credibility of each assertion is enhanced by its context in Wang's consistent depiction. All four statements are consistent with each other and consistent with the DEA's observation of events. When the defendant is attempting to introduce an out-of-court statement, the corroboration of the contents of that statement with other evidence is a factor pointing toward reliability and admission. *Chambers*, 410 U.S. at 300, 93 S.Ct. 1038. Likewise, numerous consistent confessions corroborate each other. *Id.*

Taken as a whole, the four statements bear strong indicia of reliability and are crucial to Chia's defense. The State's interest in enforcing its hearsay rules "is based on experience and grounded in the notion that untrustworthy evidence should not be presented to the triers of fact." *Chambers*, 410 U.S. at 298, 93 S.Ct. 1038. The evidence here bears strong indicators of trustworthiness. The inculpatory nature of Wang's statements and the fact that his first statement was made while he

was in imminent danger of death mark the statements with the same indicators of reliability that underlie traditional exceptions to the hearsay rule. On the particular facts of this case the State's interest in excluding the evidence is minimal while the importance of the evidence is great. On the record before us, we are firmly convinced that a mistake was committed and that Wang's statements should have been admitted into evidence.

## VI.

 A writ of habeas corpus is properly granted for a state court decision involving an unreasonable application of clearly established Federal law. 28 U.S.C. § 2254(d)(1). This standard includes a state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case. *Williams*, 529 U.S. at 407–08, 120 S.Ct. 1495.

In the present case, the trial court identified *Chambers* as the governing legal rule. *Chambers* held that when a hearsay statement bears persuasive assurances of trustworthiness and is critical to the defense it may not be excluded by a mechanistic application of state hearsay rules. *Chambers*, 410 U.S. at 302, 93 S.Ct. 1038.

 As to the importance of Wang's statements to the defense, the trial court accurately summarized what was at stake for Chia:

> The activity of Mr. Chia, if taken by itself, is subject to two reasonable interpretations: one, that he was simply trying to help out the buddy and the other, of course, knowing full well what his buddy was doing, he was there to assist and to facilitate and to encourage and aid and abet and everything else.

Despite this clear statement of Chia's position, the trial judge made the decision that

Wang's statements did not clearly help the defense. We find this conclusion to be unreasonable. Wang stated that Chia told him not to do it and that Chia was not involved in furthering or encouraging the crime. These statements are clearly helpful to Chia. If believed by the jury, they exonerate Chia. While they also show that Chia knew of the plot in advance, mere knowledge is not sufficient to sustain a conviction under an accomplice theory.

As to the reliability of the statements, the court pronounced that the statements did not "match the [Cal. Evid.Code] 1230 definition" of reliability.[1] The judge acknowledged that Wang's statements could be admitted against Wang at his own trial as statements against penal interest. The judge also evinced understanding that the statements could be admitted against Wang because people tend not to make self-inculpatory statements unless they believe them to be true. But, the court noted, at that point Wang would be a party and a different rule would apply. The judge also observed, using his own hypothetical examples, that while a statement may be "a classic declaration against penal [interests]" it could still lack the reliability "that this particular section requires." The judge further commented that he did not believe statements made "while you are in the clutches of the law" fall under § 1230.

Our analysis shows that Wang's statements bear compelling indicia of reliability. The trial court engaged in a classic example of what *Chambers* prohibits: "[W]here constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Chambers*, 410 U.S. at 302, 93 S.Ct. 1038.

The judge's distrust of post-arrest statements is also misplaced. The United States Supreme Court succinctly explained circumstances in which post-arrest statements are suspect: "Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence." *Williamson*, 512 U.S. at 601, 114 S.Ct. 2431. This rationale applies where the codefendant is *inculpating* the defendant in order to *exonerate* himself. Here Wang did just the opposite, exonerating Chia while inculpating himself.

■ The California Court of Appeal made the same error as the trial court when it pronounced Wang's post-arrest statements unreliable, citing *People v. Campa*, 36 Cal.3d 870, 206 Cal.Rptr. 114, 686 P.2d 634, 640(1984). However, *Campa* identifies post-arrest statements as inherently suspect "where a declarant in police custody seeks to exculpate himself by implicating another suspect." *Id.* Federal habeas corpus relief does not lie for errors of state law. *Estelle v. McGuire*, 502 U.S. 62, 67, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). We comment on *Campa* only to point out again that the reasoning behind suspicion of post-arrest statements obviously does not apply to the facts of this case.

---

1. Cal. Evid.Code § 1230 reads as follows: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true."

The present case is also distinguishable from *LaGrand v. Stewart*, 133 F.3d 1253 (9th Cir.1998). In *LaGrand*, Karl LaGrand's confession included two separate statements: first, Karl admitted that he stabbed the victim, and second, he said that Walter LaGrand did not stab anyone. We held that the exclusion of Karl's confession in Walter's trial did not violate Walter's due process rights because "a statement that includes both incriminating declarations and corollary declarations that, taken alone, are not inculpatory of the declarant, must be separated and only that portion that is actually incriminating of the declarant admitted under the exception." *LaGrand*, 133 F.3d at 1267–68 (citing *Williamson*, 512 U.S. at 599–600, 114 S.Ct. 2431). Here, the key portions of Wang's statements that exculpate Chia are not corollary; they are directly inculpatory of Wang.

The trial court's conclusion that Wang's statements were inadmissible under *Chambers* was clear error and an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States.

### VII.

For the foregoing reasons we conclude that Wang's four statements were both reliable and crucial to Chia's defense. Because the trial court's exclusion of these statements was an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States, the decision of the district court is REVERSED and the matter is REMANDED with instructions to GRANT the writ of habeas corpus unless the State grants Michael Chia a new trial within a reasonable time.

BRUNETTI, Circuit Judge, dissenting.

I dissent because Wang's statements do not bear sufficient indicia of reliability, and the California trial court's exclusion of these statements as inadmissible hearsay did not deny Chia his due process rights under *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

Having asserted his Fifth Amendment right against self-incrimination, Wang was unavailable to serve as a witness in Chia's trial. Thus, Chia sought to introduce hearsay statements made by Wang to the police, that were exculpatory in nature, as declarations against penal interest.[1] *See* Cal. Evid.Code § 1230 (West 1999). The trial court determined that Wang's statements did not fall within this hearsay exception, and that the exclusion of the statements did not deprive Chia of his due process rights under *Chambers*. In order to determine whether exclusion of the hearsay statements rendered Chia's trial fundamentally unfair under Sixth and Fourteenth Amendments, we must examine the statements themselves.

Co-conspirator Wang was first interviewed by the police on February 5, 1988 in the hospital emergency room prior to his undergoing surgery. Before receiving Wang's statements, the police informed Wang that he was badly injured and could possibly die in surgery for his several gun-

---

1. Section 1230 provides:
 Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true.

shot wounds. Wang stated that on February 1, 1988 he had entered into an agreement with Kow and Chen to steal $60,000 from some drug dealers. Wang admitted to shooting one of the agents and said that he did not know of anyone else involved in the actual shooting other than himself, Kow, and Chen.

A second statement was taken from Wang at 3:30 p.m. on February 5, 1988, after Wang survived the surgery. Wang told of a plan to "rip off" drug dealers. He recounted in greater detail the shooting of the men in the Volvo (e.g., Kow shot Agent Montoya and grabbed the money bag and Wang shot Agents Seema and Martinez) and details of the attempt by Kow, Chen, and himself to escape in the Nissan, and their eventual capture. No mention of Chia was made at this time.

Due to a malfunction in the tape recorder during the second interview, a third interview was conducted on the evening of February 5, 1988. Wang provided a confession that was substantially similar to that obtained in the second interview. During the third interview, however, Wang was also asked about the black Mitsubishi seen by the police. Wang explained that the Mitsubishi belonged to his friend Michael Chia. Wang said that he told Chia about the plan, and that Chia warned him against involvement and of the possibility that Chen and Kow could turn on him and rip him off.

The fourth and most detailed statement made by Wang came on February 7, 1988, when Wang was interviewed by an FBI agent. Wang stated that Kow asked him a week before the incident to help him with a "rip off" and the plan included the murder of the individuals to be robbed. Wang again said that he told his friend Chia about the plan and that Chia warned him against involvement for fear of being turned against by Kow and Chen. Chia

nevertheless drove Wang in Chia's Mitsubishi to Kow's apartment on the night of February 4 so that Wang could deliver a gun and ammunition and to learn of the final plans. Chia and Wang later went to dinner at the 8000 Club and stayed the night at a friend's house. The next morning, Chia dropped Wang off at Kow's apartment.

Chen drove Kow and Wang to Tiny Naylor's. While acting as a lookout in the restaurant parking lot, Wang saw Chia in the Mitsubishi driving around the lot. Wang explained that Chia was watching out for him and again told Wang not to do it. Wang told Chia to go home, but Chia stayed to watch out for Wang. Wang then recounted details of the "rip off," escape, and capture.

The California Court of Appeal affirmed the trial court's determination that the four statements did not fall within the statement against the penal interest provision of Cal. Evid.Code § 1230. Under California law, "a declaration against penal interest [is] admissible under Evidence Code section 1230 only as to those statements which are specifically disserving to the interests of the declarant. No collateral assertions can be permitted." *People v. Garcia,* 115 Cal.App.3d 85, 105, 171 Cal. Rptr. 169 (1981). The court found that because Chia was not interested in the admission of the portions of Wang's statements which specifically disserved Wang's interests (such as Wang's statements regarding his own involvement in the "rip off" and shooting of the DEA agents), but instead only sought to use Wang's collateral assertions that Chia was not involved in the actual shooting and that Chia tried to dissuade Wang from participating in the enterprise at all, Wang's statements were properly excluded. The California Supreme Court affirmed without comment.

The exclusion of Wang's statements was not an unreasonable application of "clearly established law" as articulated by the Supreme Court in *Chambers*. It is true that hearsay rules "may not be applied mechanistically to defeat the ends of justice," *Chambers v. Mississippi*, 410 U.S. at 302, 93 S.Ct. 1038, however, the state trial court's exclusion of Wang's statements reached neither the opposite conclusion from the Supreme Court on a question of law nor a different result on materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 401–02, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

There are fundamental differences between Wang's hearsay statements and the statements excluded in *Chambers*, and the majority has not explained why this case should not be distinguished. In *Chambers*, the Supreme Court overturned a decision to exclude a third-party confession as hearsay because that person confessed on separate occasions to three different friends, "under circumstances that provided considerable assurance of their reliability." *Chambers*, 410 U.S. at 300, 93 S.Ct. 1038. Chambers was convicted of killing a policeman in a small town in Mississippi. Gable MacDonald had confessed to the killing of the officer in a statement to Chambers' lawyer, but he later repudiated the confession. At trial, Chambers sought to show that he did not shoot the officer. He also attempted to show that McDonald was the shooter. The state trial court would not permit Chambers to introduce the testimony of three witnesses, to whom McDonald had admitted shooting the officer, on the grounds that the proffered testimony was hearsay. Under its "antiquated" rules of evidence, Mississippi recognized statements against pecuniary interest, but not statements against penal interest, as an exception to the hearsay rule. *Id.* at 302, 93 S.Ct. 1038. Observing that Chambers's defense was "far less per-

suasive" than it might have been had he been allowed to admit testimony from other sources about McDonald's confessions, *id.* at 294, 93 S.Ct. 1038, the Court held that exclusion of this testimony, crucial to Chambers's defense, denied him a fair trial guaranteed by due process. *Id.* at 300, 93 S.Ct. 1038.

Critical to the outcome in *Chambers* was the Court's determination that despite Mississippi's state evidentiary rules, the hearsay statements involved "were originally made and subsequently offered at trial under circumstances that provided *considerable assurance* of their reliability." *Id.* (emphasis added). Of particular importance, each of McDonald's confessions was made spontaneously to a close acquaintance shortly after the murder had occurred, each statement was corroborated by some other evidence in the case (e.g., McDonald's sworn, but later repudiated, confession, the testimony of an eye witness to the shooting, the testimony that McDonald was seen with a gun immediately after the shooting, and proof of McDonald's prior ownership of a .22–caliber revolver and subsequent purchase of a new weapon, as well as "the sheer number of independent confessions"), as well as the fact that the confession was in a very real sense self-incriminatory and unquestionably against interest. *Id.* at 300–01, 93 S.Ct. 1038.

None of these considerations favors Chia. Wang's four statements were all made to the police during post-arrest interrogation, and only in response to specific questions regarding the black Mitsubishi and Chia's involvement, whereas the declarant in *Chambers* made three independent statements to three different friends. As the state trial court noted, Wang was quite literally caught in the act, and it is not uncommon for someone in Wang's situation to make statements to protect an

arguably less culpable confederate, especially when that confederate is a good friend. Thus, Wang's statements can hardly be described as "spontaneous."

Furthermore, unlike in *Chambers,* there is no evidence to corroborate Wang's statements regarding Chia's purported uninvolvement, nor could Wang be impeached about these statements since he invoked his Fifth Amendment rights. Indeed, although corroborating evidence is lacking, the record does reveal Chia's own admissible statements to the police whereby he acknowledges an agreement with Wang to act as Wang's bodyguard, as well as a plan for Chia to hide somewhere near Tiny Naylor's restaurant to look out for and come to Wang's aid should Wang give the signal by sticking his arm out of the car.

Lastly, while portions of Wang's statements were undoubtedly self-inculpatory, those sections exculpatory to Chia were not against Wang's interest and therefore were not as reliable as the inculpatory parts. In *LaGrand v. Stewart,* 133 F.3d 1253 (9th Cir.1998), we held that the state trial court's exclusion of hearsay statements of a co-defendant as falling outside of Arizona's "statement against penal interest" rule, which is identical to Federal Rule of Evidence 804(b)(3), did not violate the defendant's due process rights. There, defendant Karl LaGrand twice confessed to the police to stabbing the victim. *Id.* at 1268. During both confessions, Karl LaGrand stated that he, himself, stabbed the victim, and that his co-defendant, Walter LaGrand, did not stab anyone. Based on Supreme Court precedent, we determined that "[t]he reliability that attends the inculpatory part of the declarant's confession does not afford any reliability to that part of the statement that merely exculpates [the defendant]." *Id.* at 1268. We further explained that

[b]ecause the 'statements against penal interest' exception to the hearsay rule is premised upon the inherent reliability of statements that tend to incriminate the declarant, federal courts have concluded that a statement that includes both incriminating declarations and corollary declarations that, taken alone, are not inculpatory of the declarant, must be separated and only that portion that is actually incriminating of the declarant admitted under the exception.

*Id.* at 1267–68 (citing *Williamson v. United States,* 512 U.S. 594, 599–600, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994) (noting that judges in federal courts must separate the incriminatory portions of statements from other portions for purposes of Rule 804(b)(3) because"[t]he fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts")); *Carson v. Peters,* 42 F.3d 384, 386 (7th Cir.1994) ("Portions of inculpatory statements that pose no risk to the declarants are not particularly reliable; they are just garden variety hearsay."); *United States v. Porter,* 881 F.2d 878, 882–883 (10th Cir. 1989) (if a statement exculpatory to the accused is severable from the statement inculpatory to the declarant, each statement must be separately analyzed under Rule 804(b)(3)); *United States v. Lilley,* 581 F.2d 182, 188 (8th Cir.1978) ("To the extent that a statement is not against the declarant's interest, the guaranty of trustworthiness does not exist and that portion of the statement should be excluded.").

Since we are deciding whether the exclusion of Wang's statements violated Chia's *federal* due process rights, our decision in *LaGrand v. Stewart,* and the cases to which it cites, are particularly helpful on the question of reliability. They imply that excluding the exculpatory portions of a confession do not raise due process concerns because those portions are inherent-

ly unreliable. Both the state trial court and California Court of Appeal recognized as much, noting that Chia was only interested in introducing the exculpatory portions of Wang's statements. Indeed, this is not a case where the exculpatory and inculpatory portions are intertwined in a seamless and unseverable confession. A review of the statements reveals that each was made in the course of question-and-answer style police interrogation where the direction of the questions continually and abruptly shifted from one topic to the next. For example, in Wang's third statement, he admitted that he shot a DEA agent and that he and Kow had planned the transaction to be a "rip-off" from the very beginning, all before even mentioning Chia's name. It is both simple and necessary to identify and separate the reliable inculpatory portions of the statement from those that merely exonerate Chia and do not have the same indicia of reliability. Furthermore, even if Chia also sought to admit the self-inculpatory portions, those parts would have been of questionable benefit to Chia. Unlike *Chambers*, where only one person could have shot the police officer, our case deals with accomplice and conspiracy behavior. Wang's confession in no way exonerates anyone else.

Although only persuasive, consideration of the factors set forth in *Tinsley v. Borg*, 895 F.2d 520, 530 (9th Cir.1990) does not support Chia's due process claim. Wang's statements are, at best, minimally reliable, and hence their exclusion did not render the trial fundamentally unfair. Chia has pointed to nothing in the record that requires this court to disregard the state court's findings, nor has he demonstrated that Wang's statements were otherwise reliable. *Id.* Because Wang's statements demonstrate that Chia knew of the plan to rob and murder beforehand, the slight value of Wang's testimony to Chia's defense did not outweigh the state's interest in

excluding the evidence. Therefore, Chia has not shown that his interest in the admission of Wang's post-arrest hearsay statements outweighs the state's interest in its exclusion under the hearsay rule, nor were Chia's due process rights violated. *See Galindo v. Ylst*, 971 F.2d 1427, 1429 (9th Cir.1992).

Again, this court's role is to decide whether the state trial court's exclusion of Wang's hearsay statements was an *unreasonable application* of clearly established federal law as interpreted by the United States Supreme Court. *Williams* makes clear that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *See Williams*, 529 U.S. at 410, 120 S.Ct. 1495. The trial court held an evidentiary hearing and heard arguments on the admissibility of the hearsay statements, in which it determined that the statements fell outside of § 1230 of the California Evidence Code for the same reason that exclusion of the statements does not implicate due process concerns under *Chambers*—the exculpatory statements lacked any indicia of reliability. I am not left with a firm conviction that the trial court's decision was erroneous.

I would affirm the district court's decision dismissing Chia's petition for habeas corpus.