Jose Antonio NEGRETE, Petitioner,

v.

Ernest ROE, Respondent.

No. C 00–01334 WHA.

United States District Court,
N.D. California.

June 3, 2002.

Manuel J. Baglanis, San Jose, CA, for petitioner.

Karl S. Mayer, Glenn Pruden, CA State Attorney General's Office, San Francisco, CA, for respondent.

## ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

ALSUP, District Judge.

### INTRODUCTION

In this habeas case, petitioner raises three claims of error, which respectively

assert violations of the Fifth, Sixth and Fourteenth, and Eighth Amendments. This order concludes that all of these claims fail, and therefore **DENIES** the petition. Judgment will be entered on behalf of respondent, and the clerk shall close the file.

### STATEMENT

Following a jury trial, petitioner Jose Antonio Negrete was convicted of kidnapping (Cal.Pen.Code 207(a)) (Count One); sexual battery (Pen.Code 243.4) (Count Three); two counts of attempted rape with a foreign object (Pen.Code 664/289(a)) (Counts Four and Five); kidnapping with intent to commit rape or sodomy (the former Pen.Code 207/208(d)) (Count Seven); attempted sodomy (Pen.Code 664/286(d)) (Count Eight); attempted oral copulation (Pen.Code 664/288a(d)) (Count Eleven); sodomy by force (Pen.Code 286(c)) (Count Thirteen); and penetration by a foreign object (Pen.Code 289(a)) (Count Fourteen). With respect to Counts Thirteen and Fourteen, the jury also found true the allegation that the victim was kidnapped (Pen.Code 667.61(e)(1)) and that the kidnapping was for the purpose of committing the underlying sexual offenses alleged in those counts (Pen.Code 667.8(a)). Petitioner was acquitted on six other counts, and several of the convictions detailed above were of lesser-included offenses. Petitioner was sentenced to a term of fifteen years to life, with no parole consideration for approximately thirteen years.

These convictions were predicated on the following facts. On August 11, 1995, the victim, named Brenda, and her friend Victor went to Hollywood Junction, a dance club in San Jose. After a few hours of dancing, she and Victor left at about 1:30 a.m. Unfortunately, they missed the last bus home. Petitioner and his companion, Ranulfo Rodriguez, offered to drive Brenda to a party in Redwood City. There was conflicting evidence at trial as to whether Brenda falsely agreed to go to the party, intending to leave the men as they dropped Victor off, or whether petitioner and Rodriguez agreed to drive Brenda and Victor home.

In any event, the four left the club together, with petitioner driving. Rodriguez sat in the left rear seat, next to Brenda. Petitioner stopped at a convenience store, where he purchased beer and some food. Petitioner drove to a point close to Victor's house and stopped the car. Victor left the car, but as Brenda attempted to do so Rodriguez pulled her back into the vehicle as petitioner sped off. Victor then contacted his father. The two looked around the neighborhood for Brenda, then called the police.

Meanwhile, petitioner and Rodriguez sped northward, with Brenda pleading to be let out of the car. Eventually, petitioner stopped the car at approximately 2 a.m. in an unincorporated industrial area near Redwood City. At first, he parked the car on Crocker Avenue close to its intersection with Dumbarton Avenue. The car was positioned in the middle of the street, several feet away from the curb. Crocker dead-ended one block from where petitioner parked; Dumbarton was a through street. The area was poorly lit. Petitioner and Rodriguez then stepped out of the car to urinate. Brenda heard petitioner tell Rodriguez that they could get what they wanted from Brenda, then "kick [her] to the curb." Brenda asked to be let out of the car. When she was, she attempted to run away but was caught from behind by Rodriguez.

Petitioner then ripped Brenda's skort (a combination skirt and shorts), threw her onto the ground, and sexually assaulted her. Petitioner's defense at trial was that at the time, due to his inebriated condition he believed that this and all other sexual activity occurring that night was consensu-

al. After this assault, a car driven by Alan Amador drove past. Brenda screamed for help. Rodriguez told petitioner to stop the assault. As Rodriguez and petitioner argued, Brenda attempted to run away once again. This time she was caught by petitioner, who threw her to the ground. Rodriguez then drove away. Left alone with Brenda, petitioner sexually assaulted her and hit her several times.

Rodriguez returned a few minutes after he left. He and petitioner took Brenda back into the car. Petitioner drove down Crocker Avenue, toward its dead end. The street ended in a chain-link fence topped by barbed wire. Petitioner parked the car along the curb about three-quarters of the way down the street, approximately 125 feet from the vehicle's original position. Rodriguez then committed several sexual offenses against Brenda. At the same time, petitioner took several items from Brenda's purse, including her school identification card. After Rodriguez was through, petitioner took Brenda from the car and hit her about the head and face. He inserted his penis into her anus, and put his fingers into her vagina. As petitioner was attacking her, Brenda saw a police car approach. After witnessing the attack, Amador (the passerby) had called the police. Brenda kicked petitioner in the groin and ran to the police. Petitioner tried to escape, but was apprehended at gunpoint.

Petitioner was charged with several crimes arising out of the events taking place that night. Particularly relevant to his habeas petition are his conviction on Count Seven, which charged him and Rodriguez with a second, aggravated kidnapping (in addition to the kidnapping charge for bringing Brenda to Redwood City) for moving Brenda down Crocker Avenue for the purpose of committing a sexual assault; and the sentencing enhancements found applicable as to Counts Thirteen and Fourteen, which charged petitioner with sodomy by force and penetration by a foreign object after the car had been moved to its second position on Crocker Avenue. These enhancements were predicated on a finding that a second kidnapping had been proved.

## ANALYSIS

Petitioner brings three claims for habeas relief. He argues that: (1) there was insufficient evidence to support the jury's conclusion that he committed a second kidnapping by moving Brenda approximately 125 feet down the street for the purpose of sexually assaulting her; (2) he was denied his constitutional right to present a defense by a trial-court ruling excluding a transcript of Brenda's pretrial statements, which could have been used to impeach her testimony; and (3) his sentence of fifteen years to life constitutes cruel and unusual punishment under the Eighth Amendment. None of these arguments are persuasive.

### 1. Standard of Review.

This petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Under AEDPA, an application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a state court shall not be granted with respect to any claim already adjudicated on the merits in state court proceedings unless the adjudication of that claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. 2254(d).

As used in AEDPA, "contrary to" and "involve an unreasonable application of"

federal law have somewhat distinct meanings, though they may also overlap. A state court's decision is contrary to federal law if it fails to apply the correct controlling authority or if it applies the correct controlling authority incorrectly to a case involving facts "materially indistinguishable" from those in the controlling decision. A state court's decision involves an unreasonable application of federal law if it correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or if it extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable. *Williams v. Taylor,* 529 U.S. 362, 405–12, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Van Tran v. Lindsey,* 212 F.3d 1143, 1150 (9th Cir.2000). "Unreasonable" is not the same as incorrect. It is instead comparable to the "clear error" standard—*i.e.,* reversal is allowable only where the reviewing court is left with a "firm conviction" that error has been committed. *Van Tran,* 212 F.3d at 1153–54.

### 2. Due–Process Claim.

Petitioner's first argument is that he was denied due process because there was insufficient evidence for the jury to find him guilty of Count Seven—the second kidnapping, in which Brenda was taken less than a block down Crocker Avenue from its intersection with Dumbarton to a point about three-quarters of the way toward its dead end—as well as the special allegations attendant to Counts Thirteen and Fourteen, each of which depended on a finding that he had engaged in a second kidnapping.

The state asserts that petitioner's due-process claim is merely a transmogrified version of an allegation in petitioner's first petition previously dismissed as unexhausted. Claim One in petitioner's original habeas petition provided as follows:

> Under a fair application of the applicable law in California, I only should have been convicted of one count of simple kidnapping and not one count of simple kidnapping and one count of kidnapping to commit robbery or an enumerated sex offense [hereafter "aggravated kidnapping"]. Because my conviction for aggravated kidnapping is not a product of a fair application of settled California law, my conviction for that offense violates the Due Process clause.

Claim Two in the original petition was:

> There was insufficient evidence to support the jury's verdict that I committed a second and aggravated kidnapping when I moved the complaining witness less than 125 feet down the same street.

Addressing the original petition, the state moved to dismiss Claim One (and Claim Three, not implicated in the state's present motion) on the ground that petitioner had not exhausted his remedies as to these claims. The state's motion to dismiss did not address whether petitioner had exhausted Claim Two. In a November 2001 order, the Court agreed that Claims One and Three had not been exhausted by petitioner's citation to state cases discussing federal law in his petition for review to the California Supreme Court.[1] Since the state did not address it, Claim Two was not dismissed. Petitioner was granted leave to file an amended petition deleting Claims One and Three. This he did. Claim One in the amended petition tracks Claim Two in the original petition almost word-for-word. The state, however, argues that Claim Two, like Claim One, was not properly exhausted in state court.

---

1. The order was issued prior to *Peterson v. Lampert,* 277 F.3d 1073, 1078–80 (9th Cir. 2002), which set an even stricter exhaustion standard.

This argument should have been made earlier in connection with the original motion to dismiss. The remedy sought by the state—dismissal of this petition and filing of a second amended petition deleting the present Claim One—would unnecessarily tax all parties. It remains the state's prerogative to point to petitioner's failure to exhaust. 28 U.S.C. 2254(b)(3). An application for a writ of habeas corpus may be denied on the merits, however, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state. 28 U.S.C. 2254(b)(2). Since this order concludes that the petition should be denied, it addresses petitioner's present Claim One on the merits.

With petitioner's due-process claim, the relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under California law, "the standard of asportation for [S]ection 208(d) kidnapping requires that the movement of the victim be for a distance which is more than that which is merely incidental to the commission or attempted commission of rape, oral copulation, sodomy, or rape by instrument, and that this movement substantially increase the risk of harm to the victim over and above that necessarily present in the commission or attempted commission of these crimes." *People v. Rayford*, 9 Cal.4th 1, 22, 36 Cal.Rptr.2d 317, 884 P.2d

1369 (1994). "[I]ncidental movements are brief and insubstantial, and frequently consist of movement around the premises where the incident began." *People v. Diaz*, 78 Cal.App.4th 243, 247, 92 Cal. Rptr.2d 682 (2000). Distance alone, however, is not always dispositive; movements of as little as 29 feet have been found to fulfill the requirement. *See People v. Salazar*, 33 Cal.App.4th 341, 347–49, 39 Cal. Rptr.2d 337 (1995). Relatively short distances have been found to be more than incidental when they result in a change in the "context of the environment." *Diaz*, 78 Cal.App.4th at 247, 92 Cal.Rptr.2d 682.

 Matched up against this standard, it is plain that a reasonable jury could have found the asportation element satisfied from the proof at trial. As discussed above, petitioner and Rodriguez first took Brenda to a point on Crocker Avenue near its intersection with Dumbarton Avenue. They parked in the middle of the street. After being seen by Amador, they moved the car approximately 125 feet, three-quarters of the way toward the end of the block where Crocker Avenue dead-ended. This second act of asportation formed the crux of the second kidnapping charge, Count Seven.[2] Once the car had been moved, the offenses underlying Counts Thirteen and Fourteen were committed.

In the second asportation, the car was moved 125 feet from near an intersection to a point close to the end of a dead-end street. Although the entire area was industrial in character, this movement, at a

---

**2.** The jury found petitioner not guilty of kidnapping for the purpose of a sexual assault as alleged in Count One, which related to the asportation of Brenda from San Jose to the intersection of Crocker and Dumbarton. Instead, it found him guilty only of the lesser-included offense of simple kidnapping as to that count. The Court of Appeal interpreted the jury's verdict as a conclusion that petitioner formed the intent to sexually assault Brenda while at the intersection, and later moved her down the road to facilitate these crimes. This defeated petitioner's claim that there was one, not two, acts of asportation. As presented in petitioner's habeas petition, this argument was dismissed as unexhausted by the November 2001 order; in any event, this order agrees with the Court of Appeal's reasoning.

minimum, made it more difficult for passersby on Dumbarton Avenue or First Avenue (one block south of the intersection with Dumbarton) to see the car and the events occurring thereabouts. Brenda testified that the second position on Crocker Avenue was less well-lit than the first (RT 292). In his trial testimony, Amador said that although he had seen Brenda being attacked when he first drove by the scene (with the car parked in its original position near the intersection), when he returned with police officers he could see nothing until they searched the area further (RT 177–180). In addition, by moving the car from the middle of the street to the curb, petitioner made the scene look less suspicious. Moving the car also blocked off Brenda's avenues of escape, since the road ended in a fence topped with barbed wire (RT 72–73). A reasonable jury could have concluded from all this that the movement was more than that necessary for commission of the crime, and that the second asportation substantially increased the danger to Brenda.

Petitioner regards as conclusive contrary evidence the following exchange between his counsel and Officer Powers, concerning the car's second position (RT 94):

Q: Okay. So it would be something where anybody on that street would be able to see the car as soon as you got close enough to it with lights to see it?

A: Yes.

Crocker was a dead-end street in an industrial area. It was improbable that, in the early-morning hours, anyone would be traveling on it, the situation implicated by the question and answer above. It was far more likely that someone would be traveling along Dumbarton Avenue or First Avenue. A jury could have found from the evidence presented that the car could easily be seen from Dumbarton Avenue, First Avenue or even from certain points on

Crocker itself when in its first position, but that it was better-hidden from view once it had been moved. Toward this point, an officer who arrived on the scene in response to Amador's call testified as follows on redirect (RT 97):

Q: When you first went to this general area, had you literally driven right by the first scene before you met up with Mr. Amador?

A: Yes, I did.

Q: Had you seen anything—noted anything down that dead end street or anything that brought your attention to the fact that somebody was being a victim of a crime or anything was going on at all?

A: No, I didn't.

*Rayford* is an instructive interpretation of California law on this subject. In *Rayford*, the California Supreme Court found the asportation requirement satisfied where the victim was moved 105 feet (less than the distance at issue here) from the parking lot of a closed store to the other side of a wall located at the edge of the lot. The wall blocked the view of any passersby from the parking lot side, and a tree and bushes limited the sight of people on a nearby street. *Rayford* held that on these facts, the jury could have reasonably found that the victim's forcible movement changed the context of her environment, was not merely incidental to the attempted commission of rape, and substantially increased her risk of harm. 9 Cal.4th at 23, 36 Cal.Rptr.2d 317, 884 P.2d 1369.

So too here. Petitioner could have sexually assaulted Brenda (and in fact did) while the car was parked in the first location. There was no need to move the car unless he wished to avoid detection and make it more difficult for Brenda to escape, as she had already tried to do. The movement substantially increased the danger to her because it afforded her a less-

ened chance of escape, as well as added difficulties of detection.

Since this order concludes there was sufficient evidence from which a reasonable jury could conclude that a second kidnapping had taken place, petitioner's arguments addressing the enhancement allegations necessarily fail. His attacks thereon are founded on a supposition that there was insufficient evidence to support the second kidnapping charge.

### 3. Evidentiary Ruling.

Petitioner's second claim of error allegedly warranting habeas relief is that he was prevented from putting on a full defense by a ruling at trial barring admission into evidence of the full transcripts of Brenda's pretrial statements.

After the attack but before trial, Brenda participated in multiple pretrial interviews with a nurse, the prosecutor, a detective and defense counsel. The transcripts thereof totaled 159 pages. After petitioner's counsel cross-examined Brenda (in which he probed several inconsistencies between her trial testimony and these previous statements, as discussed below), he moved to admit the full transcript of all three interviews into evidence (RT 409). The prosecutor objected because, he said, admission of the full transcripts would be confusing and a violation of the hearsay rule (RT 410–12). The trial judge decided not to admit the entire transcript, but allowed the introduction of additional inconsistencies through a witness (RT 415–16):

> **The Court:** All right. You see, the theory of admissibility as proposed would be that there is contained within the transcript or the tape, [ ] inconsistent statements that you would like to further bring to the attention of the jurors.
>
> To one degree it could be viewed as cumulative in the sense we have heard some testimony about it. On the oth-

er hand, there probably are other statements in there that you would like to present.

> **Mr. Carr (defense counsel):**
>
> What I am intending to do, if we don't do this, I will put on Mr. Babwin to go through it in the way you, the Court already talked about it, go through it that way.
>
> **The Court:** I just don't think in the face of an objection that I am in a position to tell you or say that you can, you know, it is all to be received.
>
> There, clearly I agree with you in one sense, and that is, there must be contained within the interview process many or a number of inconsistencies, some of which have been brought to the attention of the trier of fact, but it seems to me that the narrow focus of your inquiry would be those, and those alone. And to the extent you seek to dramatize those, or further bring them to the jury's attention, it seems to me that you are going to need to do that based upon a question and answer process.
>
> **Mr. Carr:** Okay. I understand the ruling.
>
> What I would ask, though, because I don't want it to appear any different, is (to) actually ask a live person about the interview that was done in Phoenix. . . .
>
> The offer would be, and I have done this in other trials, just to have Mr. Babwin say, was it asked at that point, this, that or the other thing. I don't want, for the same reasons, to have that portion denigrated because they didn't hear it from a live witness.
>
> **The Court:** Sure.

Through direct examination of San Mateo County Detective Richard Babwin, petitioner's counsel established numerous additional inconsistencies in Brenda's prior

statements (RT 477–97). Petitioner's counsel emphasized these inconsistencies in his closing statement to the jury (RT 640–47, 651–57).

Petitioner nevertheless claims that the trial court "abused its discretion by failing to introduce all of [Brenda's] out-of-court statements." Since the trial court was not responsible for *introducing* this evidence on its own, petitioner's claim must be that the trial court erroneously *excluded* the transcript. In his petition itself, however, petitioner does not point to any specific statements within the excluded transcript that would have been helpful to his case and were not brought before the jury through the examination of Detective Babwin or the cross-examination of Brenda herself. Instead, his petition refers to a "comprehensive survey" of Brenda's out-of-court statements, averring that "these statements were highly relevant and constituted evidence that was highly necessary to the success of my defense." The additional inconsistencies lie buried therein.

Review of this "comprehensive survey" indicates, however, that counsel highlighted for the jury the key discrepancies, and that pointing out additional inconsistencies would have been cumulative. Through his cross-examination of Brenda and his direct examination of Detective Babwin, petitioner's counsel brought out several inconsistencies. While cross-examining Brenda, petitioner's counsel said that he was proceeding "seriatim with (the) interviews" (RT 356) and in doing so he elicited several contradictions among Brenda's pretrial statements and her trial testimony. This included testimony on key points such as whether and how petitioner had penetrated Brenda with his penis (RT 333–34, 345–47, 350–53, 373–75, 387–88); whether Brenda had bitten petitioner on the shoulder while resisting him (RT 337); and whether Rodriguez, the co-defendant, had touched her near her vagina with his hands (RT 349). Similar inconsistencies also came out through the examination of Detective Baldwin. These inquiries were in no way circumscribed by the trial court. To the extent that additional inconsistencies were not brought to the jury's attention, that was a matter of counsel's discretion.

■ This suggests the central fallacy in petitioner's argument: The trial judge did not "exclude" any inconsistent statements. His ruling affected only the *manner* in which counsel could bring inconsistencies to the jury's attention. And so, petitioner's argument on this point—if he has any—must be that the full statements would have provided necessary context to the inconsistencies, offering probative or impeachment value above and beyond the inconsistencies themselves. Evaluating this claim, it is clear that there was no error of constitutional proportions. The incremental probative value of admitting the entire statements was minimal, and outweighed by the substantial confusion that would be attendant to admitting the more than 100–page transcript. Although the transcript was perhaps the best evidence of inconsistencies among Brenda's statements and testimony, simply dropping the transcript in the jury's lap would have made it more, rather than less, difficult for the factfinders to identify and evaluate the import of any discrepancies therein. Finally, as noted by the Court of Appeal, admission of the full transcript would have done more harm than good since Brenda's statements were in many ways consistent. The Court of Appeal did not clearly err in holding that petitioner's defense, and thus his rights under the Sixth and Fourteenth Amendments were not harmed by the ruling. *Cf. Chia v. Cambra*, 281 F.3d 1032, 1037 (9th Cir.2002).

### 4. Cruel and Unusual Punishment.

Petitioner's final claim is that his sentence of fifteen years to life, with no parole consideration for thirteen years, constituted cruel and unusual punishment under the Eighth Amendment.

The Eighth Amendment forbids only extreme sentences that are "grossly disproportionate" to the crime. *Harmelin v. Michigan*, 501 U.S. 957, 1001, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (Kennedy, J., concurring).[3] The punishment is examined in light of the gravity of the offense. *Andrade v. Attorney General of State of California*, 270 F.3d 743, 759 (9th Cir.2001). Only where an inference of gross disproportionality arises is an "intrajurisdictional" and "interjurisdictional" comparison of the penalty required to see if the penalty is excessive when compared to sentences imposed on other criminals. *Id.* at 761.

 Petitioner was convicted of kidnapping; sexual battery; two counts of attempted rape with a foreign object; kidnapping with intent to commit rape or sodomy; attempted sodomy; attempted oral copulation; sodomy by force; and penetration by a foreign object. Although petitioner received a stern sentence, this order cannot say that it was grossly excessive in light of the brutal crimes he was found to have committed. Petitioner was not a juvenile when he committed the offenses. *Cf. Thompson v. Oklahoma*, 487 U.S. 815, 835, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988) ("Less culpability should attach to a crime committed by a juvenile than to a comparable crime committed by an adult"). He will be eligible for parole consideration. In short, the Court of Appeal correctly held that the sentence was not grossly disproportionate to the crimes.

---

**3.** Justice Kennedy's concurring opinion is regarded by the Ninth Circuit as "the rule of *Harmelin.*" *Andrade*, 270 F.3d at 757, quoting *United States v. Bland*, 961 F.2d 123, 129 (9th Cir.1992).

### CONCLUSION

The writ is **DENIED.** Judgment will be entered in favor of respondent. The clerk shall close the file.

**IT IS SO ORDERED.**